Kaleigh N. Boyd, OSB #253094
**McNAUL EBEL PLLC**
600 University Street, Suite 2700
Seattle, WA 98101
Tel: (206) 467-1816
kboyd@mcnaul.com

***[Additional counsel listed on signature page]***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| **STEPHANIE CLACK**, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>**ST. CHARLES HEALTH SYSTEM, INC.**, a private, nonprofit corporation organized under the laws of Oregon,<br>Defendant. | Case No. 6:26-cv-02302<br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Stephanie Clack ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Defendant St. Charles Health System, Inc. ("St. Charles" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1. This is a class action lawsuit arising from St. Charles's collection and disclosure of Website visitors' sensitive personal health information and electronic communications to Google without prior notice and consent, through tracking mechanisms embedded in the St. Charles website at stcharleshealthcare.org (the "Website").

2. St. Charles Health System, Inc. is a private, nonprofit healthcare organization that operates an integrated healthcare system comprising hospitals, clinics, and affiliated providers across Central and Eastern Oregon. Through the Website, St. Charles allows visitors to search for physicians and medical providers, explore various medical facilities and locations, research health services, and schedule appointments.

3. Unbeknownst to Website visitors, St. Charles has knowingly implemented two tracking technologies owned by Google on the Website: the Google Analytics Tracker and the DoubleClick Tracker (collectively, the "Trackers"). When Website visitors search for providers, explore medical facilities, schedule appointments, or interact with other health-related content, St. Charles procures Google (through the Trackers) to intercept these electronic communications without visitors' consent. This includes the interception of: (a) users' searches for providers in specific medical fields; (b) users' searches for medical facilities and locations, including specialty clinics; (c) users' clicks to schedule appointments; (d) search queries entered by users into the Website's search bar; and (e) every page URL visited by users on the Website.

4. This interception of private electronic communications, which occurs without appropriate notice to visitors and without obtaining their consent, amounts to or results in (1) a violation of the federal Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.* ("ECPA"); (2) a breach of fiduciary duty and confidentiality; (3) violations of common law

protections against invasion of privacy; (4) a breach of implied contract; and (5) unjust enrichment.

5. Through this action, Plaintiff seeks to remedy these harms and bring causes of action to hold St. Charles accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

## PARTIES

6. Plaintiff Stephanie Clack is a natural person who resides in Redmond, Oregon, and is a citizen of Oregon, where she intends to remain.

7. Defendant St. Charles Health System, Inc. is a private, nonprofit healthcare organization organized under the laws of Oregon, with its headquarters located at 2500 NE Neff Rd, Bend, Oregon 97701. Defendant operates the Website at issue in this litigation.

8. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d and 45 C.F.R. Parts 160–64.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and, on information and belief, at least one member of the class is a citizen of a state different from Defendant.

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2510 *et seq.*).

11. This Court has personal jurisdiction over Defendant because its principal place of business is in the District of Oregon, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

12. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant's principal place of business is in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

*i. Overview of Website Tracking on Healthcare Websites*

13. Some websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become increasingly sophisticated, evolving from simple cookies to complex tracking systems that can monitor detailed user behavior across websites and devices.

14. Website tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. This code enables the collection of various types of data about the user's interactions with the website, which is then transmitted to third-party servers for processing and storage.

15. The most basic form of website tracking involves cookies, which are small text files stored on a user's device that contain information about their browsing activity. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

16. JavaScript-based trackers represent a more sophisticated tracking method. Website owners implement these trackers by embedding JavaScript code snippets into their website's

source code. When a user loads a webpage containing such code, the tracker is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real-time.

17. The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

18. As detailed in this Complaint, St. Charles has implemented such tracking technologies on the Website, resulting in the unauthorized interception of visitors' electronic communications by Google.

*ii. The Google Analytics Tracking Technology*

19. Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating hundreds of billions of dollars in revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted advertisements.

20. The Google Analytics 4 Tracker ("Google Analytics Tracker") is a web analytics service offered by Google that allows website owners to track visitors' actions on their website to gain insights into user behavior and to target them with personalized advertisements. St. Charles has implemented the Google Analytics Tracker on its Website.

21. The Google Analytics Tracker is a JavaScript-based tracking technology developed by Google. Website owners or administrators implement the Tracker by adding a snippet of JavaScript code to their website, typically in the header section of the site's code.

22. Once implemented, the Google Analytics Tracker loads automatically and immediately whenever a user visits a page containing its source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with significant technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Google. The surreptitious nature of the Google Analytics Tracker means that users—by design—typically have no idea that their electronic communications are being intercepted by third parties like Google.

23. The Google Analytics Tracker intercepts and collects various data points about user interactions with a website, which it calls "events," and transmits details of these events to Google. These events include page views, clicks, form submissions, video plays, file downloads, and custom events defined by the website owner.

24. When a user accesses the Website while logged into a Google Chrome browser or signed into their Google Account (such as Gmail or YouTube), Google has already assigned unique identifiers to that user through third-party cookies including 3PSID, 3PAPISID, and 3PSIDCC. These cookies are set by Google services (such as google.com) and are explicitly tied to the user's logged-in Google account. The values of these cookies are unique to each account holder and persist across sessions and devices as long as the user remains signed in. When the Google Analytics Tracker transmits data about a user's activity on the Website to Google's servers, the user's browser automatically includes these cookies in the transmission, enabling Google to associate the intercepted health information with the user's identified Google account.

25. When creating a Google account, users are required to provide an email address, meaning that data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies (such as user communications on the Website) can be linked by Google to an identifiable email address. Many users also voluntarily provide additional identifying information to Google such as their full name, phone number, home address, work address, profile photograph, and recovery email. As a result, Google can associate the data collected alongside the cookies not only with an email address, but also with a named and potentially highly personalized user profile. This enables Google to link a user's private activity on a website such as St. Charles's to their name and broader aspects of their digital identity, particularly when combined with other data collected across Google's ecosystem, such as Gmail usage, YouTube views, or Google Maps history.

26. Once the Google Analytics Tracker intercepts and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the 3PSID, 3PAPISID, and 3PSIDCC cookies to associate this data with unique user identifiers, from which it can link website interactions to individual user profiles and track users across multiple different websites, sessions, and devices when signed into their Google accounts. After the data has been processed and subsequently stored in the Google database, Google uses the data to generate reports to help analyze the data intercepted. Those reports include reports on acquisition (e.g., information about where the traffic originated and the methods by which users arrived at a site), engagement (what web pages a user visited), and demographics (a user's age, location, language, gender, and interests expressed when browsing online and engaging in purchase activities).

27. The Google Analytics Tracker can also set a different type of cookie, known as the NID cookie. The NID cookie is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately six months, unless a user manually

"clears" their cookies (Google will then automatically generate a new, unique identifier associated with the NID cookie). The NID cookie enables Google to track user preferences, browsing behavior, and ad interactions across websites that use Google Analytics or serve Google Ads where a user is not signed into a Google account on that browser. While the NID cookie does not reveal a named account identity, it still allows Google to build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on websites such as Defendant's. Google's Privacy Policy expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed the Google Analytics Tracker. Per Google's own statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity across devices."[1]

28. In addition to accessing and using the data intercepted from website users to provide its services, Google also uses the information intercepted by sites like St. Charles's to maintain and improve Google's own services, develop new services, measure the effectiveness of its advertising, and personalize content and ads that one sees on Google's and its partners' sites and applications. When combined with Google's vast data resources from its other products and services, Google Analytics data can contribute to comprehensive profiles of individuals that can be used for targeting advertisements and other commercial purposes.

*iii. The DoubleClick Tracking Technology*

---

[1] *See* Google, *Privacy Policy*, https://policies.google.com/privacy/embedded?hl=en-US (last visited October 19, 2026).

29. DoubleClick is an advertising tracking tool that is owned by Google and is designed to collect information about user behavior on websites to improve the targeting and effectiveness of advertising campaigns. DoubleClick's tracking technologies (the "DoubleClick Tracker") automate the ad buying process and use collected data for targeted advertising initiatives. St. Charles has implemented the DoubleClick Tracker on the Website.

30. Like the Google Analytics Tracker, website owners or administrators implement the DoubleClick Tracker by adding a snippet of JavaScript code to their website, typically in the header section of the site's code. This implementation process is usually simple, requiring the website administrator to copy and paste the provided code into the website's source code. The DoubleClick Tracker distinguishes itself from Google Analytics in that it specifically focuses on advertising functionality. It enables ad retargeting, which allows St. Charles to display targeted advertisements to users on other websites based on their previous interactions with the Website.

31. Once implemented, the DoubleClick Tracker loads automatically and immediately whenever a user visits a page containing the Tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with significant technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Google. The surreptitious nature of the Tracker means that users typically have no idea that their electronic communications are being intercepted by third parties like Google.

32. Also like the Google Analytics Tracker, the DoubleClick Tracker can collect data on user interactions with a website and transmit these details to Google. These interactions may include page views, clicks, form submissions, video plays, and other custom-defined actions.

While Google Analytics refers to these as "events," the DoubleClick Tracker generally tracks them as "conversions" or "activities," primarily for advertising and attribution purposes.

33. Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE cookie and the DSID cookie. The IDE cookie is a persistent advertising identifier containing a string of numbers and letters. The IDE cookie is unique to each user's browser and is used to record user actions and measure ad effectiveness. This identifier can be associated with a user's browser or device over extended periods of time. The DSID cookie is an account-linked identifier that is set when a user is logged into a Google account. It links browsing activity on non-Google websites to the user's Google account and ensures that the user's ad personalization settings are applied and respected across non-Google sites. (Collectively, the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies associated with the Google Analytics Tracker and the IDE and DSID cookies associated with the DoubleClick Tracker are referred to as the "Cookies"). The Cookies contain unique user identifiers that enable Google to connect user behavior across different websites, devices, and browsing sessions.

34. The IDE and DSID cookies can constitute personally identifiable information ("PII") as they are unique to each user and can be used to identify individuals.

35. The DoubleClick Tracker also collects and stores IP addresses in server logs. An IP address is a globally unique numerical identifier that guides or routes communications across the internet. Internet Service Providers assign IP addresses to networking devices such as modems or routers.

36. IP addresses function as the essential addressing system of the internet. Just as a telephone number routes calls to the correct household, an IP address is necessary for routing internet communications to the correct location. Importantly, IP addresses reveal the general geographic location of internet users. Free online "IP lookup" services use databases that map IP

addresses to geographic areas and potentially specific households, often providing information about the country, city, county, approximate coordinates, or even the internet service provider associated with the address.

37. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking. IP addresses allow companies to target advertisements to users in specific geographic areas with great accuracy and track user interactions across multiple websites, building detailed profiles of users' browsing habits tied to their location.

38. IP addresses are particularly powerful when combined with persistent identifiers like the IDE cookie. When individuals use their devices across different locations (home, work, coffee shops), each location has its own IP address. By tracking these movement patterns between different IP addresses and correlating them with a cookie, Google can build detailed profiles of individual users' daily routines and behaviors that distinguish them from others who may share the same IP address. This combination of cookies and IP address patterns allows Google to identify and track specific individuals with remarkable precision, even when multiple people share the same household or workplace network.

39. For these reasons, Europe's General Data Protection Regulation ("GDPR") classifies IP addresses as "personal data," recognizing that even data that has been de-identified or pseudonymized—but that can be used to re-identify a person—remains personal data. When Google combines IP addresses with the IDE cookie and the sensitive health information intercepted from the Website, it creates a comprehensive digital profile that can identify specific individuals and their medical interests.

40. The DoubleClick Tracker also works in concert with Google's vast advertising network, which spans millions of websites. This means that the scope and impact of the interception facilitated by St. Charles extends far beyond the Website, potentially affecting users'

experiences across the entire internet ecosystem. When combined with Google's other data sources, the information intercepted through the DoubleClick Tracker enables even more precise identification and tracking of individuals.

41. Upon information and belief, Google combines the sensitive health information intercepted through the DoubleClick Tracker with other data points in its possession (including data points obtained through the Google Analytics Tracker) to create comprehensive user profiles that include intimate details about individuals' medical conditions, treatment interests, and healthcare-seeking behaviors. These profiles can then be monetized through targeted advertising that may reveal or allude to users' private health concerns.

*iv. Visitors to the Website Reasonably Expect Their Information to Stay Private*

42. St. Charles operates the Website as an extension of its healthcare services, facilitating patient care and providing healthcare information. The Website allows users and patients to search for physicians by name, specialty, location, and other criteria; schedule or request appointments with physicians; search for clinic and hospital locations; obtain information about medical conditions and treatments; and access other healthcare-related resources.

43. When using these online services, visitors input their medical information, including private and confidential information regarding their medical conditions and treatment, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

44. Users of the Website reasonably expect that their communications and activities will remain private, particularly given St. Charles's status as a nonprofit healthcare provider subject to HIPAA and other privacy regulations, as well as professional and ethical obligations to protect patient confidentiality.

45. This expectation of privacy is reinforced by longstanding regulatory principles and enforcement actions in the healthcare sector. Federal privacy regulations have long recognized that protected health information extends beyond diagnosis-specific information. In 2013, HHS clarified through formal rulemaking that information need not contain specific medical terms to be protected under HIPAA: if it "is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity." 78 Fed. Reg. 5566, 5598 (Jan. 25, 2013).

46. St. Charles's conduct described in this Complaint is in violation of HIPAA, which imposes criminal penalties for knowingly disclosing individually identifiable health information ("IIHI") to third parties. 42 U.S.C. § 1320d-6(a)(3). HIPAA defines IIHI as "any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6).

47. St. Charles intended to share its patients' IIHI, which is in violation of HIPAA and common law duties.

48. Like the federal government, Oregon law has established policies and procedures for the maintenance, preservation, and storage of patient medical records. Oregon law provides that "[i]t is the policy of the State of Oregon that an individual has: (a) The right to have protected health information of the individual safeguarded from unlawful use or disclosure." Or. Rev. Stat. § 192.553(1)(a).

49. Oregon law further provides in Or. Rev. Stat. § 192.558 that protected health information ("PHI") may be used or disclosed only when consistent with prior authorization, or without such authorization only in particular, enumerated circumstances. Defendant's disclosure of PHI through the Trackers does not fit within any prior authorization or circumstance provided in Or. Rev. Stat. § 192.558.

50. Defendant's actions described herein violated both federal and Oregon law governing the protection of health information.

51. In 2023, the Federal Trade Commission and the U.S. Department of Health and Human Services Office for Civil Rights warned healthcare providers about their obligations to protect against impermissible disclosures of personal health information through web-tracking technologies such as the Trackers discussed in this Complaint, emphasizing that unauthorized disclosure of such information through trackers can violate federal law.[2]

52. This expectation of privacy is also fundamental to the physician-patient relationship and extends to all healthcare communications, including those conducted through healthcare providers' websites.

53. Users would not reasonably expect that simply by visiting the Website to search for providers, explore medical facilities, schedule appointments, or research treatment options, their sensitive health information would be intercepted by third parties like Google for purposes unrelated to their healthcare needs with St. Charles.

---

[2] U.S. Department of Health and Human Services Office for Civil Rights & Federal Trade Commission, *Re: Use of Online Tracking Technologies* (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited October 19, 2026).

*v. Defendant's Implementation of the Trackers*

54. St. Charles has deliberately implemented the third-party Google Analytics Tracker and DoubleClick Tracker in the source code of the Website, procuring Google to intercept sensitive health information and electronic communications of its patients and Website visitors without proper consent.

55. The Trackers operate on pages of the Website where users search for providers, browse medical facilities and locations, schedule appointments, and enter search queries. They operate invisibly to Website visitors, who have no meaningful way of knowing that their sensitive health queries and browsing behaviors are being intercepted by third parties.

56. The information intercepted through these Trackers by Google includes but is not limited to Plaintiff's and the Class Members': (1) searches for providers in specific medical fields, including the zip code, languages spoken, and insurance coverages accepted; (2) the specific provider pages visited by users; (3) searches for clinic and hospital locations, including specialty clinics such as breast care clinics; (4) clicks to schedule appointments, including virtual visits; (5) the content of free-text search queries entered into the Website's search bar, such as searches for "Cancer Center"; and (6) every page URL visited by users on the Website. When combined with persistent identifiers (the Cookies), this information allows Google to identify individual users and associate sensitive health information with their digital profiles.

57. The persistent identifiers used by the Trackers create digital fingerprints that allow Google to track individuals across multiple devices and browsing sessions, connecting their healthcare inquiries to broader online activities.

58. Upon information and belief, Google combines this intercepted healthcare-related data with information from its other services, creating comprehensive user profiles that include

sensitive health information which can be used for targeted advertising and other commercial purposes.

59. Upon information and belief, in addition to the Google Analytics Tracker and the DoubleClick Tracker, St. Charles has implemented or caused to be implemented other third-party tracking technologies on the Website that similarly intercept visitors' electronic communications and sensitive health information without consent. The full nature and extent of all tracking technologies deployed on the Website, the third parties receiving intercepted data, and the categories of information transmitted are known to Defendant and can only be fully determined through discovery.

60. As demonstrated in the following examples, St. Charles procures the interception of sensitive personal health data without obtaining the consent required by the ECPA.

*vi. Examples of Personal Data Collection and Disclosure on the Website*

61. ***User Searches for a Provider:*** The Website enables visitors to search for a provider based on zip code, languages spoken, and insurance coverages accepted. When a user conducts such a search, the Trackers automatically intercept and transmit to Google information about the search criteria entered and the specific providers viewed. All of these transmissions occur alongside the Cookies, allowing Google to associate the user's provider searches with the user's unique digital profile.

62. For example, when (1) a user searches for a provider in the zip code "97702" who speaks English and accepts any insurance policy, and then navigates to the profile page for a specific provider such as Kate Rajotte, then (2) the user's search criteria, selection of filters for zip code, languages spoken, and insurance coverage accepted, as well as their subsequent visit to Kate Rajotte's individual provider page, are each automatically intercepted and transmitted to

Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. The same information is simultaneously transmitted to Google by the DoubleClick Tracker, alongside the IDE and DSID cookies and the user's IP address. The user's click to get directions to the provider's location is likewise shared with Google alongside identifying cookies.

63. ***User Searches for a Location:*** The Website allows users to search for clinic and hospital locations operated by St. Charles. When a user searches for a location, such as a family care clinic, and navigates to a specific clinic page such as "Bend East Family Care Clinic," this information is automatically intercepted and transmitted in real time to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. The same information is simultaneously transmitted to Google via the DoubleClick Tracker, alongside the IDE and DSID cookies and the user's IP address. The user's click to navigate to the clinic location is likewise transmitted to Google via both Trackers alongside identifying cookies.

64. ***User Sends an Appointment Request:*** The Website transmits to Google users' online appointment scheduling requests via both the Google Analytics Tracker and the DoubleClick Tracker. After reaching a clinic page, when a user requests an appointment, including for virtual visits, this information is intercepted and transmitted to Google via the Google Analytics Tracker alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and simultaneously to Google via the DoubleClick Tracker alongside the IDE and DSID cookies and the user's IP address. This includes the user's click on "virtual visit," the user's interaction with the appointment form, the submission of the form, and the confirmation of the scheduling request. The user's current location is also transmitted to Google alongside identifying cookies. This discloses to Google that the user is a patient or is seeking to access patient-specific services through St. Charles. Accordingly, the data transmitted in these interactions is patient data.

65. ***User's Free-Text Search:*** Users may use the search bar on the Website, which allows users to search for physicians, specialties, or conditions. When a user searches for "Cancer Center," for example, this query is intercepted and transmitted to Google via the Google Analytics Tracker alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and simultaneously to Google via the DoubleClick Tracker alongside the IDE and DSID cookies and the user's IP address.

66. ***Temporal Patterns and Behavioral Analysis***: In addition to the content of searches and interactions, the Google Analytics Tracker and the DoubleClick Tracker also collect timestamp data showing precisely when each interaction occurs. This temporal information reveals behavioral patterns about users' healthcare-seeking activities. The timestamp data enables Google to determine: (a) the complete progression of users' journeys through the Website, revealing potential connections between provider searches, services viewed, and conditions researched; (b) the evolution of users' health journeys by tracking the sequence and timing of searches from initial inquiries to specific conditions to treatment options; (c) the urgency of users' health concerns based on search times; (d) the frequency and regularity of health-related searches, distinguishing between chronic condition management and acute health crises; (e) the duration users spend researching specific conditions, indicating their level of concern or the severity of their situation; and (f) patterns that may reveal work or life impacts of health conditions based on when searches occur.

67. The above information, combined with the user's Cookies (particularly if the user was logged into their Google account or signed into Chrome while accessing the Website), allows Google to identify the person who has submitted this information through the Website.

*vii. Defendant's Responsibility for Google's Interception of Electronic Communications*

68. Although the Trackers perform the technical functions of intercepting electronic communications, St. Charles bears full legal responsibility for these actions under the ECPA as the entity that has procured Google to intercept these communications.

69. St. Charles made the affirmative decision to implement the Trackers on the Website. This implementation was a deliberate action requiring Defendant's web administrators to copy the Trackers' tracking codes and insert them into the Website's source code. Without St. Charles's deliberate implementation of this code, Google would have no access to the electronic communications of visitors to Defendant's Website.

70. Defendant maintains complete control over the Website and has the ability to remove or modify the Trackers at any time. St. Charles controls which pages of the Website contain the tracking code and could choose to exclude tracking from sensitive pages where healthcare information is accessed or inputted, yet it has chosen to implement tracking across these sensitive areas of the Website. Its continued use of these Trackers represents an ongoing choice to procure Google to intercept electronic communications from visitors to the Website.

71. St. Charles has procured Google's services to intercept electronic communications from Website visitors and has arranged, aided, and abetted the interception of these communications by Google, where the data is then stored, analyzed, and potentially combined with other data in Google's possession.

72. Defendant receives direct benefits from implementing these Trackers, including detailed analytics about Website usage that inform its business and marketing decisions. These benefits further establish St. Charles's responsibility for procuring the interception practices that generate these analytics.

73. These arrangements constitute a procurement of another person to intercept electronic communications without the consent of all parties to the communication, in direct violation of 18 U.S.C. § 2511 of the ECPA.

*viii. Defendant's Failure to Obtain Consent for the Interception*

74. St. Charles fails to obtain consent from Website users before procuring the interception of their electronic communications by Google, in direct violation of 18 U.S.C. § 2511 of the ECPA.

75. St. Charles has never obtained valid consent from Plaintiff or Class Members for the interception of their electronic communications by Google.

## PLAINTIFF'S EXPERIENCES

76. Plaintiff Stephanie Clack is a patient of St. Charles. Plaintiff regularly visits the Website and used it throughout the Class Period (defined below), approximately once every couple of months, and most recently in or around late September 2026. Plaintiff is a user of the patient portal, accessible via the Website, and has used the Website to check her balances, laboratory work, and test results, and to find and schedule appointments with providers. She has used pages on the Website and specifically recalls using the providers page and inputting search terms to find providers specializing in gastroenterology and pulmonology. Plaintiff accesses the Website through the Chrome browser, primarily on her personal Android phone and also on her personal Chromebook laptop, and she was signed into her Google account on the Chrome browser at all times while using the Website. Because Defendant implemented the Trackers on the Website, Google immediately intercepted and received Plaintiff's PHI and electronic communications without her knowledge or consent. By virtue of the Trackers' operation, Google

intercepted Plaintiff's personal information, including, but not limited to, her IP address, browsing activity, and persistent identifiers, together with Plaintiff's sensitive health-related browsing and search context.

77. At no time did Plaintiff consent to the interception of her sensitive medical information and electronic communications with Defendant through the Website by Google or to Defendant enabling Google to access or intercept such information. Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Google.

78. In fact, Defendant's Notice of Privacy Practices makes no mention of Google or the Cookies.[3] As to "Business Associates," Defendant states only that it may "disclose information about you to one of our business associates, in order to carry out treatment, payment, or health care operations." *Id.* It does not inform visitors or patients that it may procure Google to access or intercept their communications. Indeed, Defendant explicitly acknowledges that "We must obtain your written permission to use or disclose your medical information for marketing purposes except in certain circumstances" not applicable here. Yet Defendant does not get written permission to use or disclose medical information before it procures Google to intercept that information on its Website.

**INJURY TO PLAINTIFF AND CLASS MEMBERS**

79. St. Charles's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiff and Class Members in multiple ways.

[3] *See* St. Charles Health System, *Notice of Privacy Practices* (effective Jan. 1, 2020), https://www.stcharleshealthcare.org/sites/default/files/Documents/Patients%20Rights/FL_CMP_NoticePrivacyPractices2020.pdf (last visited October 19, 2026).

80. *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiff and Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. The interception of these communications violated Plaintiff's and Class Members' reasonable expectation that their interactions with a healthcare provider would remain private.

81. *Loss of Data Value*: Plaintiff and Class Members have been deprived of the economic value of their personal data. In today's digital economy, personal data, especially health-related information, has significant commercial value.

82. In a 2014 report by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium.[4] The FTC subsequently brought a lawsuit against a data broker for selling location data regarding people who visit abortion clinics.[5]

83. For years, data harvesting has been one of the fastest growing industries in the United States. Some companies even allow individuals to flip the script and sell their own personal data for a profit.[6]

---

[4] Federal Trade Commission, *Data Brokers: A Call for Transparency and Accountability* (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf (last visited October 19, 2026).

[5] *See* Federal Trade Commission, *FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations* (Aug. 29, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other (last visited October 19, 2026).

[6] *See* Datacoup, *The personal data revolution*, https://datacoup.com/ ("Internet behemoths have made the quickest and largest fortunes in history on the backs of your personal data. . . . Those days are over. . . . Rather than the digital behemoths exploiting your data for their own economic gain, monetize your own valuable asset as you see fit.") (last visited October 19, 2026).

84. The value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.[7]

85. Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information. NPR reported that health data can be "more expensive than stolen credit card numbers."[8]

86. Plaintiff's and Class Members' private and personal data, including their protected health information, have a recognized monetary value. Defendant's procurement of unauthorized interception by Google of this sensitive personal data has deprived Plaintiff and Class Members of the economic value of their personal property without proper consideration and has resulted in Defendant unjustly enriching itself at the expense of Plaintiff and Class Members.

87. *Chilling Effect on Healthcare Communication:* Defendant's conduct has undermined patient trust and created a chilling effect on digital healthcare communications. Plaintiff and Class Members can no longer confidently use the Website to seek medical information, locate healthcare providers, research treatments, or manage their healthcare without fear that their activities are being intercepted by third parties.

88. *Risk of Further Use of Intercepted Data:* Once intercepted by Google, Plaintiff's and Class Members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or

---

[7] *See* Adam Tanner, Time, "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited October 19, 2026).

[8] Aarti Shahani, NPR, *The Black Market For Stolen Health Care Data* (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-for-stolen-health-care-data (last visited October 19, 2026).

potentially used by additional third parties, causing continued and future harm. For example, Google may combine the health-related data it intercepts from Defendant's Website with data from its other services (such as Google Search, YouTube, or Gmail) to create detailed user profiles that include sensitive health information without users' consent.

89. *Statutory Injury:* Independent of the above harms, Defendant's violation of the ECPA has caused Plaintiff and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## **CLASS ACTION ALLEGATIONS**

90. Plaintiff brings this action on behalf of herself individually and on behalf of all other persons similarly situated pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

91. The Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States who visited St. Charles Website pages on which trackers were installed within the applicable statute of limitations period (the "Class Period").
>
> Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members, and staff; and (e) any jurors assigned to this case.

92. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

93. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. St. Charles is a major healthcare system in Central and Eastern Oregon with thousands of care providers and multiple hospital and clinic locations. Upon information and belief, the Website

receives substantial numbers of unique visitors each year, most of whom had their electronic communications intercepted by Google during the relevant time period.

94. *Commonality and Predominance*: There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Defendant implemented the Trackers on the Website;

(b) Whether the Trackers intercepted Website users' electronic communications;

(c) Whether Defendant procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d) Whether Defendant obtained Website users' consent to procure the interception of their electronic communications;

(e) Whether Defendant's conduct violated 18 U.S.C. § 2511 of the ECPA;

(f) Whether Defendant's procurement of interception of Website users' electronic communications constitutes a breach of fiduciary duty or confidentiality;

(g) Whether Defendant's conduct constitutes an invasion of privacy;

(h) Whether Defendant has been unjustly enriched through its conduct;

(i) Whether Defendant breached an implied contract with Plaintiff and Class Members;

(j) Whether Plaintiff and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(k) Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to injunctive relief.

95. *Typicality:* Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and Class Members all visited the Website and had their electronic communications intercepted by Google without their consent. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members and are based on the same legal theories.

96. *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

97. *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. A class action provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

98. *Injunctive Relief Appropriate*: Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. § 2510 *et seq*.) (On Behalf of Plaintiff and the Class)

Plaintiff incorporates the above paragraphs by reference and further alleges—

99. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

100. The ECPA protects both the sending and receipt of communications and provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

101. The transmissions between Plaintiff and Class Members and the Website are "transfer[s] of signs, signals, writing, imagery, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce" and therefore constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

102. The ECPA defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The health information intercepted here, including physician searches, medical conditions, appointment requests, and treatment inquiries, constitutes content under the ECPA.

103. The Trackers implemented by Defendant on the Website constitute "electronic, mechanical, or other device[s]" within the meaning of 18 U.S.C. § 2510(5) because they are specifically designed to intercept and acquire the contents of electronic communications between Website visitors and Defendant.

104. The ECPA defines "intercept" as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The Trackers acquire the contents of users' communications in real-time, contemporaneously with their transmission.

105. By deliberately implementing the tracking codes of Google Analytics and DoubleClick on its Website, Defendant procured Google to intercept its visitors' electronic communications. Specifically: (a) Defendant made the affirmative decision to embed each Tracker's code into its Website; (b) Defendant's implementation of these codes was the necessary predicate act that enabled Google to intercept users' communications; without Defendant's actions, Google would have no access to the communications; (c) Defendant controls which pages contain the tracking codes and could have excluded them from sensitive areas where health information is transmitted, but chose not to; (d) Defendant maintains ongoing relationships with Google and continues to facilitate its interception of user communications; and (e) Defendant receives benefits from this arrangement, including analytics data and advertising capabilities, creating a quid pro quo relationship.

106. Through this procurement, Defendant caused Google to intercept, in real-time, the electronic communications of users containing sensitive health information, engaging in a violation of 18 U.S.C. § 2511(1)(a).

107. By intentionally using or endeavoring to use the contents of these intercepted communications, knowing or having reason to know the information was obtained through illegal interception, Defendant violated 18 U.S.C. § 2511(1)(d).

108. Plaintiff and Class Members had a reasonable expectation that their communications with a healthcare provider's website would remain confidential and would not be intercepted by third parties that Defendant had procured for commercial purposes.

109. Plaintiff and Class Members did not consent to Defendant's procurement of third-party interception and sharing of their health information for advertising and analytics purposes.

110. Defendant was not acting under the color of law when procuring these interceptions, and no other exception to ECPA liability applies. The one-party consent exception does not apply because Defendant's procurement was for the purpose of committing an independent crime or tort, namely the unauthorized disclosure of PHI in violation of HIPAA, 42 U.S.C. § 1320d-6; violation of the Oregon Health Information Privacy Act, Or. Rev. Stat. §§ 192.553 to 192.581; breach of confidence; and invasion of privacy.

111. As a direct result of Defendant's violations, Plaintiff and Class Members are entitled to: (a) actual damages or statutory damages, whichever is the greater of $100 a day for each day of violation or $10,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

**COUNT II: BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY**
**(On Behalf of Plaintiff and the Class)**

Plaintiff incorporates the above paragraphs by reference and further alleges—

112. Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

113. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations, as well as Oregon state law governing PHI, Or. Rev. Stat. §§ 192.553 to 192.581.

114. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

115. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' personal health information (including PHI and PII), Defendant became a fiduciary by its undertaking and guardianship of the personal health information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' personal health information; (2) to notify Plaintiff and Class Members of disclosure of their personal health information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

116. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed its Trackers to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant as well as the contents of those communications, including personal health information.

117. These disclosures were made for commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged. The unauthorized disclosures of Plaintiff's and Class Members' personal health information were intentionally caused by Defendant's employees acting within the scope of their employment.

118. The third-party recipients included, but may not be limited to, Google. Such information was received by these third parties in a manner that allowed them to identify Plaintiff and the individual Class Members.

119. Defendant's breach of the common law implied covenant of trust and confidence is further evidenced by its failure to comply with federal and state privacy regulations, including by failing to ensure the confidentiality and integrity of electronic personal health information it created, received, maintained, and transmitted; by failing to protect against reasonably anticipated unauthorized uses or disclosures of electronic personal health information; by impermissibly disclosing personal health information to unauthorized third parties; and by failing to keep private information confidential as required by HIPAA and its implementing regulations and by Or. Rev. Stat. § 192.553 *et seq*.

120. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the healthcare provider and the patient.

121. As a direct and proximate result of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information and communications, Plaintiff and Class Members were damaged by Defendant's breach in that their sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private; Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; Defendant eroded the essential confidential nature of the provider-patient relationship; Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; Defendant's actions diminished the value of Plaintiff's and Class Members' personal health information; and Defendant's actions violated the property rights Plaintiff and Class Members have in their personal health information.

122. Plaintiff and Class Members are entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation.

123. Defendant also took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data.

**COUNT III: INVASION OF PRIVACY—INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Class)**

Plaintiff incorporates the above paragraphs by reference and further alleges—

124. Plaintiff and Class Members had a legitimate expectation of privacy in their communications with Defendant regarding their healthcare needs, appointment bookings, medical conditions, and treatment preferences and were accordingly entitled to the protection of this information against disclosure to unauthorized parties.

125. Defendant intentionally intruded upon the seclusion and private affairs of Plaintiff and Class Members by implementing the Trackers on the Website that procured the interception of sensitive, personal health information without proper authorization or consent.

126. Defendant's intrusion upon Plaintiff's and Class Members' private communications, and its transmission of those communications to Google, would be highly offensive to a reasonable person. Internet users have a reasonable expectation that their personally identifiable communications with healthcare providers' websites will remain private, particularly when those communications involve sensitive health-related matters, including research about treatments and the scheduling of appointments in relation to those treatments.

127. Defendant's intrusion was intentional and knowing, as it deliberately implemented the Trackers on the Website to capture user communications for its own business purposes.

128. As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered injury, including loss of their reasonable expectation of privacy and diminution in the value of their personal information.

129. Plaintiff and Class Members are entitled to damages, including compensatory and punitive damages, in an amount to be determined at trial.

**COUNT IV: IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

Plaintiff incorporates the above paragraphs by reference and further alleges—

130. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their valuable personal health information and compensation for their medical care.

131. When Plaintiff and Class Members provided their personal health information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their personal health information without consent.

132. Plaintiff and Class Members would not have entrusted Defendant with their personal health information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose personal health information without consent.

133. Plaintiff and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose personal health information without consent.

134. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' personal health information without consent to third parties like Google.

135. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their personal health information.

136. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT V: QUASI-CONTRACTUAL UNJUST ENRICHMENT**
**(In the Alternative to Count IV, on Behalf of Plaintiff and the Class)**

Plaintiff incorporates the above paragraphs by reference and further alleges—

137. Defendant benefited from the use of Plaintiff's and Class Members' valuable personal health information and unjustly retained those benefits at their expense.

138. Plaintiff and Class Members conferred a benefit upon Defendant in the form of personal health information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits.

139. Defendant was aware of the benefit conferred because it intentionally installed Trackers for the purpose of receiving the benefits of using patient data for advertising purposes.

140. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

141. The benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Oregon and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the practices alleged in this Complaint.

142. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and on behalf of all other Class Members similarly situated, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

(b) Declare that Defendant's actions, as described herein, violate the ECPA;

(c) Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiff and the Class statutory damages as provided by the ECPA;

(e) Award Plaintiff and the Class punitive damages;

(f) Award Plaintiff and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct;

(g) Grant injunctive relief requested by Plaintiff, including, but not limited to, requiring Defendant to cease procuring the interception of Website users' communications without proper consent; destroy all user data intercepted through the Trackers; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(h) Award Plaintiff and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiff and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: October 20, 2026

Respectfully submitted,

*/s/ Kaleigh N. Boyd*
Kaleigh N. Boyd (OSB #253094)
**McNAUL EBEL PLLC**
600 University Street, Suite 2700
Seattle, WA 98101
Tel.: (206) 467-1816
kboyd@mcnaul.com

Katrina Carroll (*pro hac vice* forthcoming)
**CARROLL SHAMBERG LLC**
200 N. LaSalle, Suite 1650

Chicago, IL 60601
Telephone: (872) 215-6205
katrina@csclassactions.com

*Counsel for Plaintiff and the Class*